# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# BEAUFORT DIVISION

| | |
|---|---|
| Dennis Barker, ) | |
| ) | |
| Plaintiff, ) | C.A. No.: 9:12-cv-1901-PMD |
| ) | |
| v. ) | |
| ) | |
| Washington National Insurance Company, ) | **ORDER** |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court upon cross motions for summary judgment filed by Plaintiff Dennis Barker ("Barker") and Defendant Washington National Insurance Company ("WNIC"). For the reasons set forth below, the Court denies Barker's motion for summary judgment and grants WNIC's amended motion for summary judgment.

## BACKGROUND

Barker is insured by WNIC under an individual "Limited Benefit Health Coverage" insurance policy ("Policy") that was originally issued in 1989 in South Carolina and bears the mark of "Form MM-5 (SC)." Barker holds a South Carolina insurance producers' license, and he sold the Policy to himself after he learned of the benefits from the representatives and marketing literature of Western Fidelity, WNIC's predecessor-in-interest. The Policy is guaranteed renewable for life, has $2,000,000.00 in lifetime benefits, and does not have a coordination of benefits provision. Cash benefits under the Policy are to be paid directly to Barker—the sole policyholder—and, absent assignment, are not to be paid to the medical provider. Barker has paid all required premiums, and the Policy has never been amended through endorsement, rider, or otherwise.

1

Throughout its history, the Policy has changed underwriting companies several times. After WNIC became the insurer for the Policy, Barker began to make multiple claims as a result of medical care. For many years, Barker complained to WNIC, and formally to the South Carolina Department of Insurance, that the claims were being adjusted incorrectly because WNIC deducted from the amount owed the Preferred Provider Organization ("PPO") discounts that Barker's other insurance plan had negotiated with the medical providers. These issues were resolved in Barker's favor, and WNIC paid benefits to Barker that were not based upon the actual amount Barker owed to a medical provider. Instead, the benefit payments were based upon the total charges for the medical services, including the amount the provider had written off pursuant to its agreement with Barker's other insurer.

Around June 2010, Barker became a primary beneficiary under Medicare. On September 7, 2010, Barker claimed benefits under the Policy through the submission of a statement for medical charges for medical services he received at Palmetto Baptist Medical Center from August 10 to August 11, 2010. WNIC asserts that this letter was the first notice it received that Barker was a Medicare recipient. Barker contends that WNIC first received written notice a few months earlier when he submitted a claim and attached a Medicare statement.

On October 11, 2010, Barker sent a letter to WNIC stating that under his interpretation of the Policy, WNIC owed him $39,508.88. He further stated: "ALSO, PLEASE BE ADVISED I AM NOT REQUESTING A REDUCED PREMIUM," implying that he did not want the "Medicare clause to kick in, and [he] would just like to keep paying [WNIC] the same premium." Oct. 11, 2010 Letter, D.E. 42-2 at 51; Barker Dep. 70:1.14-71:1.4, D.E. 42-2 at 14.

WNIC adjusted the claim by paying benefits based only on the debt Barker owed to the medical provider. WNIC paid $2,226.03, the "Total Amount Due" listed on the hospital bill submitted by Barker, plus $6.59 interest for a total payment of $2,232.62. Barker challenged

2

WNIC's use of Medicare adjustments to reduce the benefits payable, and WNIC—by itself and through a separate claims administrator, Automated Benefit Services ("ABS")—denied the claim. Barker, through written correspondence, insisted that the use of Medicare adjustments was improper just as similar adjustments had been improper in the past, and he asserted that WNIC was obligated to pay him the "Total Charges" of $55,241, less the amount that Medicare paid, for a total obligation of more than $41,000. By letter dated October 29, 2010, WNIC upheld its decision to pay only $2,232.62 on the basis that the Policy provides that WNIC's "liability was limited to the difference of what Medicare approved and what Medicare paid plus the portion not covered by Medicare." D.E. 42-2 at 48.

Barker retained counsel and filed a lawsuit in the Beaufort County Court of Common Pleas on June 4, 2012, asserting causes of action for breach of contract and bad faith. In his complaint, Barker alleges that the Policy provides for payment of benefits directly to the insured as a result of qualifying medical charges, regardless of price adjustments made by other insurance providers, including Medicare. Barker further alleges that WNIC, individually and by and through its agents, is liable for breach of contract and bad faith in refusing to pay the claims. On July 10, 2012, WNIC removed the case to this Court. Upon completing discovery, the parties filed the instant cross motions for summary judgment.

## JURISDICTION

This Court has subject matter jurisdiction over this matter based on 28 U.S.C. § 1332, as there is complete diversity of the parties and the amount in controversy is over $75,000. Barker is a citizen of South Carolina, and WNIC, a corporation formed under Indiana law with its principal place of business in Indiana, is a citizen of Indiana. Although not specifically alleged in the complaint, the actual amount in controversy at the time of removal appears to be at least

3

$40,000.[1] However, because Barker seeks actual and punitive damages, attorney's fees, and costs against WNIC, the total amount in controversy exceeds $75,000. *See Am. Health & Life Ins. Co. v. Heyward*, 272 F. Supp. 2d 578, 581 (D.S.C. 2003) (holding that claims for punitive damages "must be included in the calculation of the amount in controversy"); *Thompson v. Victoria Fire & Cas. Co.*, 32 F. Supp. 2d 847, 848 (D.S.C. 1999) (holding that amount in controversy exceeded $75,000 where complaint sought punitive damages, consequential damages, and attorney's fees and costs beyond the $25,000 in actual damages claimed); *Woodward v. Newcourt Comm. Fin. Corp.*, 60 F. Supp. 2d 530, 532 (D.S.C. 1999) (observing that plaintiff's "claim for punitive damages alone makes it virtually impossible to say that this claim is for less than the jurisdictional amount"). Thus, this Court has jurisdiction over this case.

## STANDARD OF REVIEW

To grant a motion for summary judgment, a court must find that "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). The judge is not to weigh the evidence but rather must determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). All evidence should be viewed in the light most favorable to the nonmoving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

---

[1] Barker asserts that at the time he filed his motion for summary judgment, his actual damages exceeded $139,000 because WNIC continued to deny coverage for subsequent medical bills that had been subject to Medicare adjustments.

## ANALYSIS

**I.     General Principles of South Carolina Insurance Law**

Because this action falls under the diversity jurisdiction granted to the federal courts by 28 U.S.C. § 1332, the Court looks to the law of South Carolina to determine the standards by which to evaluate the insurance policy. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Under South Carolina law, insurance policies are subject to the general rules of contract construction. *B.L.G. Enters., Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999). "When a contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used." *Id.* The court must enforce, not write, contracts of insurance and must give policy language its plain, ordinary, and popular meaning. *Id.* "[I]n construing an insurance contract, all of its provisions should be considered, and one may not, by pointing out a single sentence or clause, create an ambiguity." *Yarborough v. Phoenix Mut. Life Ins. Co.*, 225 S.E.2d 344, 348 (S.C. 1976). "A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Hawkins v. Greenwood Dev. Corp.*, 493 S.E.2d 875, 878 (S.C. Ct. App. 1997). "Where language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted." *Poston v. Nat'l Fid. Life Ins. Co.*, 399 S.E.2d 770, 772 (S.C. 1990).

An insurer's obligation under a policy of insurance is defined by the terms of the policy itself and cannot be enlarged by judicial construction. *S.C. Ins. Co. v. White*, 390 S.E.2d 471, 474 (S.C. Ct. App. 1990). A policy clause extending coverage must be liberally construed in favor of coverage, while insurance policy exclusions are construed most strongly against the

5

insurance company, which also bears the burden of establishing the exclusion's applicability. *M&M Corp. of S.C. v. Auto-Owners Ins. Co.*, 701 S.E.2d 33, 35 (S.C. 2010); *Owners Ins. Co. v. Clayton*, 614 S.E.2d 611, 614 (S.C. 2005). "However, if the intention of the parties is clear, courts have no authority to torture the meaning of policy language to extend coverage that was never intended by the parties." *S.C. Farm Bureau Mut. Ins. Co. v. Wilson*, 544 S.E.2d 848, 850 (S.C. Ct. App. 2001).

## II.     Claim for Breach of Contract

Barker alleges that WNIC breached the Policy when it deducted the Medicare adjustments from its payment of benefits. He argues that pursuant to the Policy as written, marketed, and construed, as well as pursuant to claims adjusted by WNIC in the past, he was entitled to benefits based upon the balance of the charges after only the deduction of the amount paid to the provider by Medicare. WNIC, on the other hand, argues that under the plain language of the Policy, it properly deducted the Medicare adjustments and paid Barker the proper amount.

Both parties point to the Insuring Clause and Part IA's "Hospital Expense Benefits" provision to support their position. On its cover page, the Policy states: "This policy provides benefits for actual expenses incurred for loss resulting from accident and sickness to the extent herein provided." Policy at Cover Page, D.E. 45-5. The "Insuring Clause" provides, in relevant part: "We will pay 100% in full of the expenses incurred for services and materials as set out in Part I of the policy which are in excess of the Deductible Amount." *Id.* at 1. Part I sets forth the benefits provisions for various medical services, including hospital expenses, doctor visits, and fees charged by certain specialists. Of importance in this case, Part IA's explanation of "Hospital Expense Benefits" provides:

> If You are confined in a hospital as a resident bed patient on account of injury or sickness, We will pay 100% in full of the usual, customary, and regular charges for the following items of hospital and medical expense incurred during such

> period for any one injury or sickness . . . . In addition, We will pay 100% in full the usual, customary and regular charges incurred during Your stay for any other necessary hospital expenses not shown in the above list. Expenses incurred for comfort or convenience items such as telephone, radio, television or take home items are not covered.

*Id.* at 2.

Barker emphasizes the "100% in full" language, while WNIC emphasizes "expenses incurred." According to Barker, the Policy requires WNIC to "pay 100% in full of the usual, customary, and regular charges" for his hospital and medical expenses, as well as for the surgeon's fee. *See id.* Part IB. Surgeon's Fee for Surgical Operations ("If, as a result of such injury or sickness, an Eligible Insured shall have surgical operations performed by a licensed surgeon, the Company will pay 100% in full of the usual, customary and regular charge by the primary surgeon for the surgical operations."). He further contends that "usual, customary, and regular charges" refers to the amount originally charged by the hospital prior to any reductions resulting from any prior agreement between Medicare and the hospital. Thus, Barker concludes that under the Insuring Clause and the "Hospital Expense Benefits" provision, WNIC was obligated to pay him for the total charges listed on the hospital's bill ($55,241), less the amount that Medicare paid, for a total obligation of more than $41,000. WNIC counters that Barker's reading of the Policy omits the "expenses incurred" phrase from both the Insuring Clause and the "Hospital Expense Benefits" provision. According to WNIC, Barker never incurred any expenses in excess of the amount paid by WNIC because the hospital had agreed, even before rendering services to Barker, that it would not charge him more than the Medicare-approved fee. WNIC maintains that it properly applied the Policy because it paid Barker for any legal liability he incurred to the provider.

The Policy's Insuring Clause provides that WNIC "will pay 100% in full of the expenses incurred for services and materials as set out in Part I of the policy." The Policy does not

7

provide a definition for "incurred." However, South Carolina law defines "expense incurred" for insurance purposes as "a thing for which there exists [an] obligation to pay, either express or implied." *Gordon v. Fidelity & Casualty Co. of N.Y.*, 120 S.E.2d 509, 512 (S.C. 1961). In *Gordon*, the South Carolina Supreme Court interpreted an insurance policy in which the insurer agreed "to pay all reasonable expense incurred" for necessary medical and surgical services. *Id.* The court, finding "no uncertainty or ambiguity in the language of the policy," determined that "a thing for which there exists no obligation to pay, either express or implied, cannot in law be claimed to constitute an 'expense incurred.'" *Id.* (observing that the term "[i]ncur emphasizes the idea of liability"); *see Calhoun v. Calhoun*, 529 S.E.2d 14, 17 (S.C. 2000) ("The term 'incur' is commonly defined as 'to become liable or subject to.'"). The court concluded that because the insured, a career soldier, had received free medical treatment in an army hospital and was under no obligation to pay for his hospitalization, "he 'incurred' no expense within the meaning of the provision of the policy of insurance." *Gordon*, 120 S.E.2d at 513. Thus, the insurer "was not liable to the [insured] for the reasonable cost of his hospitalization, because the [insurer] had limited its liability to pay only 'all reasonable expenses incurred' by the [insured]." *Id.* Similarly, applying South Carolina law and the plain, unambiguous language of the Insuring Clause to the case at bar, WNIC agreed to pay Barker 100% in full of the expenses for which he is obligated to pay.

As a Medicare recipient, Barker at no time was obligated to pay the total charges listed on the hospital's bill, i.e., $55,241. Under 42 U.S.C. § 1395cc(a)(1)(A), a provider of services can participate in Medicare only if the provider files an agreement with the Secretary of Health and Human Services. Pursuant to this agreement, the participant accepts "assignment" of the Medicare payment, meaning that the provider must accept the Medicare approved charge as the full charge for the covered service and "shall not collect from the beneficiary . . . more than the

applicable deductible and coinsurance." Medicare Participating Physician or Supplier Agreement, Form CMS-460 (04/10), *available at* http://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/CMS-Forms-Items/CMS007566.html; *see* Costs & Assignment, Medicare.gov, http://www.medicare.gov/your-medicare-costs/part-a-costs/assignment/costs-and-assignment.html (last visited Apr. 24, 2013) (explaining that, under Medicare Part A, "Assignment means that your . . . provider . . . agrees (or is required by law) to accept the Medicare-approved amount as full payment for covered services" and can "charge you only the Medicare deductible and coinsurance amount"). The Southern District of New York recently addressed the issue of whether a Medicare recipient can "incur" the full fee a medical provider lists on its bill prior to applying the agreed-upon Medicare reductions, concluding that "[w]here Medicare contracts with a medical provider to set fees for a given service, the Medicare beneficiary is never liable for the amount forgone by a doctor under that agreement." *Metz v. U.S. Life Ins. Co.*, No. 09 Civ. 10250 (BSJ), 2010 WL 3703810, at *3 (S.D.N.Y. Sept. 21, 2010). The court further explained:

> A doctor who accepts Medicare assignment has signed an agreement with Medicare to accept the Medicare-approved amount as full payment for covered services. [He] agree[s] to . . . charge [the beneficiary only] the Medicare deductible and coinsurance amount and wait for Medicare to pay its share. Given this agreement, it is essentially impossible that Plaintiff would ever face liability for a provider's hypothetical full fee.

*Id.* (internal quotations and citations omitted). The Second Circuit Court of Appeals affirmed, concluding that under New York law, the Medicare recipient "did not incur more than the amounts that her physicians had agreed ahead of time they would seek from her." *Metz v. U.S. Life Ins. Co.*, 662 F.3d 600, 602 (2d Cir. 2011). Similarly, this Court concludes that under South Carolina law, Barker was never obligated to pay more than the amount that the hospital had agreed to accept as full payment under Medicare, which amount appears to be about $15,929.29.

9

The Policy's phrase "usual, customary, and regular charges" in Part IA does not change this analysis.  Barker cites multiple cases that have concluded that insurance policy terms similar to "usual, customary, and regular charges" were ambiguous.  *See Ward v. Dixie Nat'l Life Ins. Co.*, 257 F. App'x 620 (4th Cir. 2007) (on rehearing) (holding that "actual charges" in a cancer treatment benefit policy is ambiguous because it could refer to the amount actually billed or the amount actually owed); *Comer v. Life Ins. Co. of Ala.*, C.A. No. 0:08-228-JFA, 2010 WL 2232204, at *4 (D.S.C. June 2, 2010) (finding ambiguous the term "charge" as used in the policy's definition for "usual and customary charge").  However, the policies in those cases did not include the term "incur," and thus did not limit coverage only to payments for which the beneficiaries were obligated or liable.  *See Phila. Am. Life Ins. Co. v. Buckles*, 350 F. App'x 376, 379 (11th Cir. 2009) (concluding that the plain meaning of "actual charges *incurred*" in a supplemental cancer and specified disease insurance policy "is the amount the provider accepts from an insurer as full satisfaction of the policyholder's liability") (emphasis added).  Here, Part IA's "Hospital Expense Benefits" provision includes "incurred," thus limiting the benefits to payment of those amounts for which Barker is obligated to pay.  *See* Policy at 2 ("We will pay 100% in full of *the usual, customary, and regular charges* for . . . hospital and medical *expense incurred* during such period for any one injury or sickness . . . .  In addition, We will pay 100% in full *the usual, customary and regular charges incurred* during Your stay for any other necessary hospital expenses not shown in the above list.") (emphases added).  Therefore, WNIC is required to pay 100% of the expenses or charges incurred—that is, the charges for which Barker was obligated to pay—for Barker's hospital and medical expenses.

Having determined that the benefits available under the Policy are limited to those expenses for which Barker was obligated to pay, the Court now turns to the Medicare Provision of the Policy.  The Medicare Provision, located under the Policy's "Limitations" section, states:

> If You are eligible for the Federal Medicare Program or any amendments thereto or any like or similar State or Federal health or medical care program except any program that would require this insurance to be primary coverage. [*sic*] Our liability will be limited to that portion not covered by such program to the extent provided by the policy. Should You not claim the benefits payable under said law, Our liability will be limited to that portion of the loss, within the coverage and limits of the policy, that would have been paid had You claimed Your benefits under Medicare Parts A and B.
>
> When You give written notice of such eligibility to Us Your premiums shall be reduced to that amount payable for the excess benefits available under this policy to You. Such reduced premium rate shall become effective at the next Renewal Date following the receipt of written notice by Us and shall be evidenced by the issuance of a written endorsement to this policy by Us.

Policy at 8.

Under Barker's reading of the Medicare Provision, the portion not covered by Medicare is the full amount of the pre-adjusted hospital charges minus the amount paid by Medicare; in other words, he believes the only part "covered" by Medicare is the amount actually paid by Medicare (and not the Medicare adjustments). However, as the Court has already found, Barker was never obligated to pay the pre-Medicare-adjusted amount for the hospital services; therefore, the most WNIC could be required to pay under the Policy is the total charges after the Medicare adjustments were made, or $15,929.29. The Court agrees with Barker that Medicare "covered" the amount it paid to the hospital, or $ 13,703.26. Therefore, the Court concludes that under the terms of the Policy, WNIC's liability is limited to $2,226.03.

Plaintiff alternatively argues that the Medicare Provision cannot be applied to his claim because WNIC has not issued an endorsement to his Policy. The Court disagrees with Plaintiff's reading of the Provision. The Medicare Provision clearly states that if an insured is eligible for Medicare, the insurer's liability will be limited to that portion not covered by the program. Nothing in the Medicare Provision requires the issuance of an endorsement before the limitation can be applied. Indeed, the Medicare Provision plainly states that the reduced premiums will not

11

go into effect until the next Renewal Date, at which time the written endorsement will be issued. Furthermore, Plaintiff expressly stated in a letter to WNIC that he was "NOT REQUESTING A REDUCED PREMIUM."  (Oct. 11, 2010 Letter) (emphasis in original).  Therefore, the Court finds that the lack of written endorsement or reduction of premiums has no effect on the application of the Medicare Provision.

Plaintiff suggests that the Medicare Provision conflicts with the "Other Insurers" clause in the Policy.  "Part V Uniform Provisions" of the Policy includes a section entitled "Insurance with Other Insurers," which provides in relevant part:

> An Insured Person may have other valid coverage with another insurer which applies to a loss covered by this policy.  Other valid coverage may reduce the benefits payable under this policy.
>
> The benefits payable under this policy will not be reduced by other valid coverage if the Insured notifies Us in writing that there is other valid coverage on an Insured Person(s).  The Insured must notify Us before a loss begins.
>
> The benefits payable under this policy will be reduced by other valid coverage if the Insured has not notified Us in writing, before the loss begins, that such Insured Person(s) has other valid coverage.

Policy at 11.  However, in reading the Policy as a whole, the Court concludes that the Medicare Provision merely limits, rather than conflicts with, the "Other Insurers" clause.  In the absence of Medicare, the Policy will pay to Barker 100% of the expenses incurred for medical treatment, regardless of whether another insurer has already paid these expenses.  However, once Barker qualifies for Medicare, the Policy limits payment to 100% of the medical expenses incurred that have not already been covered—or paid—by Medicare.  The Court sees no conflict or ambiguity created by the application of these provisions.

Finally, Barker argues that latent ambiguities exist in that WNIC now refuses to pay the pre-adjusted total charges even though previous claims were paid for 100% in full of the total charges from a provider, despite the fact that another insurer had adjusted the bills according to

12

prior agreements with the provider. However, under South Carolina law, if a contract is not ambiguous, evidence regarding inconsistent custom or conduct of the parties cannot be admitted; such evidence is admissible only to give meaning to an ambiguous contract term. *C.A.N. Enters., Inc. v. S.C. Health & Human Servs. Fin. Comm'n*, 373 S.E.2d 584, 586 (S.C. 1988) ("Extrinsic evidence giving the contract a different meaning from that indicated by its plain terms is inadmissible."); *Moss v. Porter Bros., Inc.*, 357 S.E.2d 25, 28 (S.C. Ct. App. 1987) ("[E]xtrinsic evidence of a usage or custom is not admissible where the intent and meaning of the parties as expressed in a contract are clear and unambiguous, especially where the purpose of the evidence is to vary the plain, unambiguous terms expressed in a contract.") (alterations and quotations omitted). Here, the Court has not identified an ambiguous term in the Policy. Accordingly, the Court will not consider the parties' prior conduct.

In summary, the Court finds that WNIC did not breach the Policy. Under the unambiguous terms of the Policy, WNIC is obligated to pay Barker 100% in full of the medical expenses incurred, i.e., 100% of the expenses for which Barker is obligated to pay. Barker was never obligated to pay more than the post-Medicare-adjusted medical charges, which totaled about $15,929.29. Pursuant to the Medicare Provision, WNIC promised to pay only that portion of the $15,929.29 that was not covered by Medicare. Barker concedes that Medicare covered $13,703.26 of the charges. Therefore, under the terms of the Policy, WNIC was obligated to pay benefits directly to Barker in the amount of $2,226.03. It is undisputed that WNIC paid Barker $2,226.03 plus $6.59 in interest. Accordingly, because WNIC did not breach the contract, the Court grants summary judgment on behalf of WNIC for the breach-of-contract claim.

## II.     Claim for Bad Faith

Under South Carolina law, the elements of a cause of action for bad faith refusal to pay benefits under a contract of insurance are:

> (1) the existence of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract; (4) causing damage to the insured.

*Crossley v. State Farm Mut. Auto. Ins. Co.*, 415 S.E.2d 393, 396-97 (S.C. 1992). "Generally, if there is a reasonable ground for contesting a claim, the denial of the claim does not constitute bad faith." *Hansen v. United Services Auto. Ass'n*, 565 S.E.2d 114, 119 (S.C. Ct. App. 2002). Barker cannot establish all of the elements of his bad faith claim because, as this Court has held, WNIC paid all of the benefits due under the contract. Accordingly, the Court grants summary judgment in favor of WNIC as to the claim for bad faith.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that Barker's Motion for Summary Judgment is **DENIED**, and WNIC's Amended Motion for Summary Judgment is **GRANTED**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**April 24, 2013**
**Charleston, SC**

14